# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| TERRANCE L. ERISMAN and DAVID FOUTS, individually and on behalf of PERCONA, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2020-0903-JRS |
| PETER ZAITSEV and THOMAS BASIL, | ) ) ) | |
| Defendants, | ) ) ) | |
| and | ) ) | |
| PERCONA, LLC, a Delaware limited liability company, | ) ) ) | |
| Nominal Defendant. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: September 23, 2021
Date Decided: December 29, 2021

Richard Jones, Esquire and Peter C. McGivney, Esquire of Berger Harris LLP, Wilmington, Delaware and Brian M. Gottesman, Esquire of Gabell Beaver LLC, Wilmington, Delaware, Attorneys for Plaintiffs Terrance L. Erisman and David Fouts.

Daniel A. Griffith, Esquire and Quinn Griffith, Esquire of Whiteford Taylor & Preston LLC, Wilmington, Delaware and William F. Ryan, Jr., Esquire of Whiteford Taylor & Preston LLP, Baltimore, Maryland, Attorneys for Defendants Peter Zaitsev, Thomas Basil and Percona, LLC.

**SLIGHTS, Vice Chancellor**

Plaintiffs, Terrance L. Erisman and David Fouts, two members of Percona, LLC ("Percona" or the "Company"), bring this action against the Company's two directors, Defendants, Peter Zaitsev and Thomas Basil, for breaches of contract and fiduciary duties.[1] The now-operative First Amended Complaint (the "Amended Complaint") consists of two counts.[2]

In Count One, Plaintiffs assert that Defendants breached the Company's LLC Agreement (later defined) by (1) failing to make distributions to the Company's members (the "Members" or, individually, a "Member") so that they could pay themselves excessive "remuneration," and (2) exposing the Members to actual and potential adverse tax consequences by issuing inaccurate K-1s to each Member.[3] The Amended Complaint also alleges that Defendants breached the LLC Agreement and the Option Agreements (later defined) by redeeming select Members' units at inflated values.[4]

In Count Two, Plaintiffs assert that Defendants breached their fiduciary duties to the Company and its Members by (1) paying themselves excessive remuneration while misstating the funds available to Members for tax distributions, (2) unfairly

---

[1] Pls.' Verified First Am. Compl. (D.I. 12) ("Am. Compl.") ¶¶ 1–4, 7–8.

[2] Am. Compl. ¶ 1.

[3] Am. Compl. ¶¶ 76–77.

[4] Am. Compl. ¶¶ 77–78.

diluting certain Members' interests when the Company acquired Tokutek, Inc. ("Tokutek"), (3) falsely reporting Company valuations to the IRS to avoid paying taxes, which resulted in the Company incurring fines, (4) manipulating financial statements to misstate income and mispresent the Company's revenue, which resulted in inaccurate tax reporting for the Company and, by extension, the Members, and (5) ignoring multiple opportunities to sell the Company at a price that would have allowed Members to achieve a positive return on their investments.[5]

Defendants have moved to dismiss the Amended Complaint under Chancery Rule 12(b)(6) (the "Motion").[6] They argue the claims are subject to dismissal as a matter of law for failure to state viable claims, failure to bring timely claims and, as to the purported derivative claims, failure to well-plead demand futility as required under Chancery Rule 23.1.[7]

After careful consideration, I am satisfied the Motion must be granted in its entirety. Plaintiffs' breach of contract claims, as asserted in Count One, are not well-pled. As for Count Two, Plaintiffs' complaint fails to well plead non-exculpated

---

[5] Am. Compl. ¶¶ 84–87, 89–90. Accounting for overlapping claims, as discussed below, Plaintiffs assert five distinct claims of wrongdoing against Defendants.

[6] Defs.' Mot. to Dismiss Pls.' First Am. Compl. (D.I. 16). I note that Defendants cite to only Rule 12(b)(6) in their motion to dismiss but then argue for dismissal under both Rule 12(b)(6) and Rule 23.1 in their briefs filed in support of the motion. (D.I. 16).

[7] Defs.' Opening Br. in Supp. of their Mot. to Dismiss Pls.' First Am. Compl. (D.I. 16) ("DOB") at 7–27.

2

claims against either director.  Because all claims are dismissed for failure to plead viable claims, I need not address Defendants' other theories for dismissal.  For the sake of completeness, however, I do briefly address why at least four of Plaintiffs' five distinct claims could be dismissed as time-barred by laches.

## I.  BACKGROUND

I have drawn the facts from the well-pled allegations in the Amended Complaint and documents properly incorporated by reference or integral to that pleading.[8]  For purposes of this Motion, I accept as true the Amended Complaint's well-pled factual allegations and draw all reasonable inferences in Plaintiffs' favor.[9]

### A. Parties and Relevant Non-Parties

Plaintiffs and Defendants are Members of the Company.[10]  Plaintiff Erisman is a resident of California,[11] and Plaintiff Fouts is a resident of North Carolina.[12] Fouts was the Company's Chief Financial Officer from February 2012 to June 2014,

---

[8] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting that on a motion to dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint).

[9] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

[10] Am. Compl. ¶¶ 4, 8.

[11] Am. Compl. ¶ 2.

[12] Am. Compl. ¶ 3.

3

its interim controller from March 2015 to September 2015, and remained with the Company in various capacities through early 2016.[13]

Defendant Basil is a resident of Maryland,[14] and Defendant Zaitsev is a resident of North Carolina.[15] At all relevant times, Zaitsev and Basil were (and remain) members of the Company's board of directors (the "Board") and "Managers" of the Company as defined in the Company's operating agreements and the Delaware Limited Liability Company Act (the "LLC Act").[16]

Nominal Defendant, Percona, is a Delaware limited liability company formed on August 21, 2012.[17] The Company's principal business is the development of open-source electronic database solutions, including for a software platform known as MySQL.[18] Zaitsev and Basil are the only members of the Company's Board and generally have the power to manage the Company's day-to-day affairs.[19]

---

[13] Am. Compl. ¶¶ 3, 36.

[14] Am. Compl. ¶ 7.

[15] Am. Compl. ¶ 6.

[16] Am. Compl. ¶ 8. *See* 6 *Del. C.* § 18-101, *et seq.*

[17] Am. Compl. ¶¶ 5, 11.

[18] Am. Compl. ¶ 12.

[19] Am. Compl. ¶ 18.

Non-party, Eileen Doody, is the Company's Chief Executive Officer.[20] Non-parties, Bill Schuler, Todd Spain, Nikki Morton and Robert Young (collectively, the "Departing Series B Members") are all former officers of the Company.[21] Upon their departure from the Company, Defendants caused Percona to redeem the Departing Series B Members' units at above-market prices.[22]

Before the Company's April 2015 acquisition of its assets (the "Tokutek Acquisition"), non-party, Tokutek, was a developer and distributor of enterprise-class database solutions.[23] The Tokutek Acquisition was memorialized in a Contribution Agreement between the Company and Tokutek, dated April 7, 2015.[24]

### B. Equity Structure and Ownership of the Company

As of April 7, 2015, the effective date of the First Amendment to Limited Liability Company Agreement of Percona, LLC (the "First Amendment"),

---

[20] Am. Compl. ¶ 57. I note that Ms. Doody describes herself as the Company's CFO in her affidavit, attached as Exhibit 1 to Defendants' Opening Brief ("Doody Aff.").

[21] Am. Compl. ¶ 50.

[22] *Id.*

[23] Am. Compl. ¶ 31.

[24] Am. Compl. ¶ 32; *see generally* Doody Aff. at Ex. I (the "Contribution Agreement"). Because the documents attached to the Doody Aff. are "integral to Plaintiff[s'] claims and incorporated by reference into the [Amended] Complaint, [they are] properly before the Court on Defendants' motion to dismiss." *Calma v. Templeton*, 2015 WL 1951930, at *2 n.4 (Del. Ch. Apr. 30, 2015) (citing to *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69 (Del. 1995)).

the Company had three classes of units—Series A, Series B and Series C.[25] As discussed below, the different rights attached to each class are at the heart of Plaintiffs claims and Defendants' arguments in support of dismissal.

### 1. Ownership of Units

At all material times, Zaitsev has been the sole holder of Series A Units and, as such, the only Series A Member.[26] Likewise, Tokutek is the sole holder of Series C Units and the only Series C Member.[27] Plaintiffs Erisman and Fouts and Defendant Basil are among several holders of Series B Units.[28] The LLC Agreement occasionally refers to the holders of the Company's units as "Unitholders."

Zaitsev acquired his Series A Units before the original LLC Agreement was executed on August 21, 2012.[29] Erisman, Fouts and Basil, like all Series B Members, received their Series B Units as a benefit of employment with the Company.[30]

---

[25] *See generally* Ex. A to Doody Aff. (together with all amendments, the "LLC Agreement"). The Company's initial Limited Liability Company Agreement was dated August 21, 2012. *See* Am. Compl. ¶ 13. It was amended and restated by the Limited Liability Company Agreement of Percona, LLC, dated November 13, 2013. *See* Am. Compl. ¶ 14.

[26] Am. Compl. ¶ 17; *see generally* the LLC Agreement.

[27] First Amendment, Recitals.

[28] Am. Compl. ¶¶ 19–23.

[29] *See* the LLC Agreement.

[30] Am. Compl. ¶¶ 19–23.

According to Plaintiffs, each Series B Member has executed substantially identical Membership Interest Unit Option Agreements ("Option Agreements").[31]

Erisman was issued one million Series B Units in December 2012 and, at that same time, executed an Option Agreement, which gave him an option, subject to vesting and other requirements, to acquire an additional four million Series B Units (the "Erisman Option Units").[32] Between January 1, 2013, and July 1, 2016, Erisman became fully vested in 2,500,000 of the Erisman Option Units.[33]

In August 2012, Fouts executed an Option Agreement that granted him an option, subject to vesting and other requirements, to acquire a certain number of Series B Units (the "Fouts Option Units").[34] Between April 1, 2013, and July 1,

---

[31] Am. Compl. ¶ 20.

[32] Am. Compl. ¶ 19.

[33] Am. Compl. ¶ 22.

[34] Am. Compl. ¶ 23. According to the Amended Complaint, Fouts executed his Option Agreement in 2013. Yet, the executed copy of Fouts' Option Agreement, attached as Exhibit D to the Doody Aff., is dated as of August 30, 2012. Plaintiffs did not attach a different version of Fouts' Option Agreement bearing a 2013 execution date. In fact, the only exhibit attached to the Amended Complaint is a blackline comparing the Amended Complaint and the initial complaint. Without any evidence to support Plaintiffs' proffered execution date, it would appear Fouts entered into his Option Agreement in 2012. Ultimately, however, the resolution of this factual dispute is unnecessary because the outcome remains the same regardless of whether Fouts' Option Agreement was executed in 2012 or 2013.

2014, Fouts exercised rights under his Option Agreement such that his total ownership stake in the Company increased to 562,500 Series B Units.[35]

Tokutek was issued three million Series C Units as partial compensation for the Tokutek Acquisition.[36] In addition to issuing the Series C Units, the Company financed the Tokutek Acquisition by delivering a $2,000,000 promissory note to Tokutek's owners payable over five years and agreeing to pay Tokutek's owners a royalty stream based on future revenues derived from certain intellectual property transferred in connection with the acquisition.[37]

### 2. Rights and Privileges of the Different Classes of Units

Under the LLC Agreement, the rights and privileges associated with the three classes of units are nearly identical, with two critical exceptions: voting and preferred payments.[38] The first difference favors holders of Series A Units, while the second favors holders of Series C Units.

### a. Voting Rights

Under Section 3.1 of the LLC Agreement, each Series A Unit entitles its holder to one vote. In contrast, Sections 3.1(c) and 8.2(a) provide that the holders

---

[35] *Id.*

[36] *See generally* the First Amendment to the LLC Agreement (explaining that the Company's primary purpose for adopting the First Amendment was to authorize, create and issue the Series C Units in connection with the Contribution Agreement).

[37] Am. Compl. ¶ 32.

[38] Am. Compl. ¶¶ 16, 33.

8

of Series B and Series C Units have no voting rights at all.[39]  Likewise, the LLC

Agreement does not provide any consent or approval rights to Series B Members.[40]

The LLC Agreement instead vests such rights primarily with the Series A Member

and, in a few circumstances, the Series C Member.[41]  In this regard, the Series A

Member is not obliged to provide any notice to the Series B Members before taking

any actions within the Series A Member's authority.[42]

According to the LLC Agreement, the Board and officers of the Company

"have full power and authority to do all things on such terms as they may deem

necessary or appropriate to conduct, or cause to be conducted, the business and

affairs of the Company."[43]  The LLC Agreement confers broad oversight authority

---

[39] *Id.*

[40] Before the First Amendment, only the Series A Member's approval was required to amend, modify, supplement or restate the LLC Agreement.  LLC Agreement §13.5. The First Amendment added language that requires the Series C Member's consent to any amendments, modifications, supplements, restatements or waivers that would affect the Series C Member or its rights while not affecting the other Members. First Amendment ¶ 8.  The First Amendment also provides that the Series C Member's consent is required for "any amendment, modification, supplement, restatement or waiver of: (i) the number of authorized Series C Units under Section 3.1(a), (ii) Section 3.1(d), (iii) Section 4.5, (iv) Section 6.1(e), (v) this Section 13.5, in each case as it relates to the Series C Units or the Sole Series C Member, or (vi) any term or provision of Exhibit B." *Id.*

[41] LLC Agreement § 8.4.

[42] *Id.*

[43] LLC Agreement § 8.1.

to the Series A Member, including the exclusive right to remove or replace any director on the Board.[44]

Section 8.4(b) of the LLC Agreement expressly provides that the authorization and approval of certain actions may not be delegated to the Board or the Company's officers and may be taken only if approved by the Series A Member (i.e., Zaitsev). These include, in pertinent part, (a) any agreement to acquire assets with a purchase price or fair market value in excess of $100,000, (b) the issuance of additional units, and (c) any potential sale of all or substantially all of the Company's assets.

### b. Economic Preferences

The second key difference between the membership classes is that the holders of Series C Units are afforded preferential economic benefits. As set forth on Exhibit B to the First Amendment, only the Series C Units are entitled to (a) a preference payment if the Company undergoes a change in control and (b) a royalty stream related to the assets acquired in the Tokutek Acquisition.[45]

---

[44] LLC Agreement § 8.2(a).

[45] Am. Compl. ¶ 33.

### C. Plaintiffs' Allegations

Plaintiffs' assert a number of disjointed claims that may fairly be summarized as follows:

- Defendants breached the LLC Agreement and their fiduciary duties when they paid themselves excess remuneration instead of making distributions to the Members (the "Distribution Claim");[46]

- Defendants breached the LLC Agreement and their fiduciary duties when they manipulated financial statements to misstate income and misrepresent the Company's financial situation, which resulted in inaccurate tax reporting by the Company and, by extension, by the Members (the "Tax Reporting Claim");[47]

- Defendants breached the LLC Agreement and Option Agreements when they failed to use the valuation method mandated in Section 3.2 of the Option Agreements and instead overpaid the Departing Series B Members (the "Redemption Claim");[48]

- Defendants breached their fiduciary duties by causing the Company to enter into the Tokutek Acquisition because the dilution the Series B Members suffered from the issuance of the Series C Units was disproportionate to the value the Company obtained by acquiring Tokutek's assets (the "Dilution Claim");[49]

- Defendants breached their fiduciary duties when they caused the Company to falsely report Company valuations to the IRS in order to avoid paying taxes, which caused the Company to incur fines (the "Valuation Claim");[50] and

---

[46] Am. Compl. ¶¶ 77, 84–85.

[47] *Id.*

[48] Am. Compl. ¶ 77.

[49] Am. Compl. ¶ 84.

[50] Am. Compl. ¶¶ 84, 86–87.

11

- Defendants violated their fiduciary duties to the Company and its Members by ignoring multiple opportunities to sell the Company at fair market value to at least three different qualified buyers (the "Failure to Sell the Company Claims").[51]

Unsurprisingly, many of Plaintiffs' allegations turn on contractual rights and obligations under the LLC Agreement or Option Agreements. In addition to the Members' contractual rights described above, the following provisions of the operative contracts are relevant to my analysis.

### 1. The LLC Agreement

Article 8 of the LLC Agreement sets out the Company's governance structure and the corresponding rights, responsibilities and procedures.[52] As stated above, Section 8.1 provides that, with a few exceptions listed in Section 8.4, the Company's business and affairs shall be managed by the Company's directors (the "Directors" or, individually, a "Director").[53] And, under the Board's direction, the Company's officers shall carry out the Company's day-to-day activities.[54] Sections 8.2 and 8.3 address powers, responsibilities and procedures pertaining to the Directors and

---

[51] Am. Compl. ¶ 90.

[52] *See generally* LLC Agreement § 8.1.

[53] *Id.*

[54] *Id.*

officers, respectively.[55]   Finally, Section 8.4 contains a list of all decisions that require approval by the Series A Member, as discussed above.[56]

Article 9 of the LLC Agreement provides for exculpation and indemnification. Section 9.1 is of particular relevance here.  Specifically, Section 9.1(a) exculpates the Directors from liability in a manner that parallels the exculpation codified in 8 *Del. C.* § 102(b)(7) by providing that the Company's Directors (here, Zaitsev and Basil) shall not be subject to any monetary liability "to the Company or any Member" for "any actions taken, or actions failed to be taken" in their capacity as a director except for:

> (i) liability for acts or omissions not in good faith or which involve intentional misconduct or knowing violation of Law, (ii) liability with respect to any transaction from which such Person derived an improper personal benefit, and (iii) liability from any breach of such Person's duty of loyalty to the Company, in each case described in clauses (i), (ii), and (iii) preceding, as determined by a final, nonappealable order of a court of competent jurisdiction.

---

[55] *See generally* LLC Agreement § 8.2 (providing for, among other things, the composition requirements of the Board; that "[a]ny Director may be removed with or without cause only by the majority vote of the Series A Unitholders"; the resignation procedure for Directors; how vacancies on the Board are handled; quorum and voting requirements for actions taken by the Board; the timing of general and special meetings of the Board; notice; requirements for meetings of the Board; and compensation of Directors); *see generally* LLC Agreement § 8.3 (providing for, among other things, the term, appointment, removal and resignation of any officer of the Company; that the Board decides the compensation for officers; and job descriptions for the Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, and Vice Presidents).

[56] *See generally* LLC Agreement § 8.4.

13

The status of fiduciary duties under the LLC Agreement is further clarified in Section 9.1(b), which states:

> To the extent that, at Law or in equity, a Director (or its Affiliate) has duties (including fiduciary duties) or liabilities relating thereto to the Company or the Members, such Persons acting in connection with the Company' business or affairs shall not be liable to the Company or to any Member for its good faith reliance on the provisions of this Agreement.  The provisions of this Agreement, to the extent that they restrict or eliminate or otherwise modify the duties (including fiduciary duties) and liabilities of a Director or its Affiliates otherwise existing at Law or in equity, are agreed by the Members to replace such other duties and liabilities of such Indemnitee.

### 2.  The Option Agreements

Section 3 of the Option Agreements, including those executed by Plaintiffs and the Departing Series B Members, governs the transferability of the underlying option.[57]  In Section 3.1, the Option Agreements provide the Company with a right to redeem a Member's Series B Units in the event the units will pass to a spouse by reason of the Member's death or a decree of a divorce court.  At Section 3.2, the Option Agreements outline a specific method by which fair market value for the redeemed securities must be determined.[58]

### D. The Inspection Demand

On June 17, 2019, Erisman served a books and records demand (the "Demand") on the Company and Defendants under Section 18-305 of the

---

[57] Am. Compl. ¶ 21.  *See, e.g.*, Exs. B, D, E, F, G and H to Doody Aff.

[58] *Id.*

LLC Act.[59]  Defendants responded by producing a relatively small number of documents in late 2019, subject to Erisman entering into a Confidentiality Agreement.[60]  Plaintiffs advised Defendants that Fouts, a financial professional, would review the documents.[61]  Neither the Company nor Defendants objected and Fouts proceeded to review the documents produced by the Company. [62]

Plaintiffs maintain they first became aware of the grounds for this action during the course of Fouts' review.[63]  In early 2020, Erisman sought additional clarification from the Company regarding some of the documents.[64]  The Company declined to provide a substantive response.  Instead, on February 5, 2020, the Company advised Plaintiffs that no further documents would be provided.[65]

## E. Procedural History

On October 19, 2020, Plaintiffs, both individually and derivatively on behalf of the Company, filed their initial complaint against Defendants.[66]

---

[59] Am. Compl. ¶ 71.

[60] Am. Compl. ¶¶ 72–73.

[61] Am. Compl. ¶ 73.

[62] *Id.*

[63] Am. Compl. ¶ 74.

[64] *Id.*

[65] *Id.*

[66] (D.I. 1).

On November 30, 2020, Defendants moved to dismiss the initial complaint in its entirety.[67] Plaintiffs did not oppose the motion to dismiss, choosing instead to file the Amended Complaint.[68] On March 31, 2021, Defendants filed a motion to dismiss the Amended Complaint in its entirety.[69]

## II. ANALYSIS

On a motion to dismiss, the court takes well-pleaded factual allegations in the complaint as true, draws reasonable inferences in the light most favorable to plaintiff and dismisses a claim only when plaintiff could not "recover under any reasonably conceivable set of circumstances susceptible of proof."[70] But a plaintiff cannot rest on conclusory allegations.[71] And "a claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law."[72] Accordingly, the question I must answer for each of Plaintiffs' claims is "whether, and to what extent, the well-pleaded facts (as distinct

---

[67] (D.I. 8).

[68] (D.I. 12).

[69] (D.I. 16).

[70] *Renco Gp., Inc. v. MacAndrews AMG Hldgs. LLC*, 2015 WL 394011, at *5 (Del. Ch. Jan. 29, 2015) (quoting *Savor*, 812 A.2d at 896–977 (Del. 2002) (internal quotations marks omitted)); Ch. Ct. R. 12(b)(6).

[71] *Clinton v. Enter. Rent-A-Car Co*., 977 A.2d 892, 895 (Del. 2009); *see also Santa Fe Pac.* 669 A.2d 59 at 65–66 ("Conclusory allegations will not be accepted as true without specific supporting factual allegations.").

[72] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

16

from conclusory statements), construed most favorably to the plaintiff[s], can be found to state a claim."[73]  When determining the answer to this question, I must consider the extent to which Section 9.1 of the LLC Agreement—the exculpation provision—affects Plaintiffs' claims.

## A. The Exculpation Provision

It is the explicit policy of the LLC Act "to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements."[74]  "LLC agreements are contracts that are enforced according to their terms, and all fiduciary duties, except for the implied contractual covenant of good faith and fair dealing, can be waived in an LLC agreement."[75]  This waiver of duties, and related exculpation for breaches of duties, depending on the language

---

[73] *Santa Fe Pac.*, 669 A.2d 59 at 62.

[74] 6 *Del. C.* § 18-1101(b)

[75] *Kahn v. Portnoy*, 2008 WL 5197164, at *3 (Del. Ch. Dec. 11, 2008) (citing to 6 *Del. C.* § 18-1101(c)); *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 290 (Del. 1999) ("The [LLC] Act can be characterized as a 'flexible statute' because it generally permits members to engage in private ordering with substantial freedom of contract to govern their relationship, provided they do not contravene any mandatory provisions of the Act."); *Zimmerman v. Crothall*, 62 A.3d 676, 702 (Del. Ch. 2013) (holding that "the fiduciary duties of a member, manager, or other person that is a party to or bound by a limited liability company agreement may be expanded or restricted or eliminated by provisions in the limited liability company agreement") (cleaned up); 6 *Del. C.* § 18–1101(c) ("To the extent that, at law or in equity, a member or manager . . . has duties (including fiduciary duties) to a limited liability company or to another member or manager . . . , the member's or manager's . . . duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement . . . .").

of the operating agreement, can apply to both breach of fiduciary duty and breach of contract claims.[76]

As required under Delaware law, the drafters of the Company's LLC Agreement made "their intent to [modify] fiduciary duties plain and unambiguous."[77] The language of Section 9.1(b) unmistakably modifies the fiduciary duties owed by the Directors and their "affiliates" by "replacing" those duties with a contractual standard of care that holds directors to account when "acting in connection with the Company's business or affairs" only when they fail to rely on the provisions of the LLC Agreement in good faith.[78] Further, Section 9.1(a) explicitly provides that Directors will not be held liable to the Company or any Member for monetary damages arising from "any actions taken, or failed to be taken, in its capacity as a Director" except for (i) "acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of

---

[76] *See* 6 *Del. C.* § 18-1101(e) ("A limited liability company agreement may provide for the limitation or elimination of any and all liabilities *for breach of contrac*t *and breach of duties* (including fiduciary duties) of a member, manager or other person to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement; provided, that a limited liability company agreement may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.") (emphasis added); *see generally* LLC Agreement § 9.1.

[77] *See Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *9 (Del. Ch. Apr. 20, 2009) (holding that "the drafters of chartering documents must make their intent to eliminate fiduciary duties plain and unambiguous."); *see also Ross Hldg.*, 2014 WL 4374261, at *12 (same).

[78] LLC Agreement § 9.1(b).

Law," (ii) "with respect to any transaction from which such Person derived an improper personal benefit," and (iii) "any breach of such Person's duty of loyalty to the Company. . . ."[79]

As noted, Plaintiffs organize their claims into two counts. Count One asserts three breach of contract claims and Count Two asserts five claims styled as breaches of fiduciary duties owed to the Company and its Members. With the contractual standards governing manager conduct in mind, I address each in turn.

## B. Count One – Breach of Contract

In Count One, Plaintiffs assert the Distribution Claims, Tax Reporting Claims, and Redemption Claim. As discussed above, all three claims brought under Count One rest on allegations that Defendants breached the LLC Agreement, and the Redemption Claim also alleges a breach of the Option Agreements. Defendants argue that each of these claims fails as a matter of law on two grounds. *First*, Plaintiffs have failed to plead a cognizable claim. And *second*, the claims are time-barred by laches. I agree on both fronts.

Under Delaware law, to recover for breach of contract, a plaintiff must well plead and then prove "a contractual obligation, whether express or implied, a breach of that obligation by the defendant, and resulting damage to the plaintiff."[80]

---

[79] LLC Agreement § 9.1(a).

[80] *Moore Bus. Forms, Inc. v. Cordant Hldgs. Corp.*, 1995 WL 662685, at *7 (Del. Ch. Nov. 2, 1995).

"[Because] [t]he construction of a contract is a question of law,"[81] it is well understood that "a motion to dismiss is a proper framework for determining the meaning of contract language."[82] Accordingly, when assessing whether the contract claims survive Defendants' Motion, it is appropriate to begin with a construction of the contracts alleged to have been breached by employing well-worn canons of contract construction.[83] As previously noted, the LLC Agreement's exculpation provision will also affect the viability of the breach of contract claims.

### 1. The Distribution Claim

Plaintiffs allege that Defendants breached unidentified contractual commitments by "diverting Company funds to themselves in the form of excess remuneration," in excess of market rates, instead of making appropriate distributions to Members.[84] Plaintiffs, however, fail to plead *any* facts regarding the amounts of

---

[81] *77 Charters, Inc. v. Gould*, 2020 WL 2520272, at *19 (Del. Ch. May 18, 2020) (internal quotations omitted).

[82] *Majkowski v. Am. Imaging Mgmt. Servs., LLC*, 913 A.2d 572, 581 (Del. Ch. 2006); *see also MKE Hldgs. Ltd. v. Schwartz*, 2019 WL 4723816, at *9 (Del. Ch. Sept. 26, 2019) (stating "contractual duty (if any) created by an LLC operating agreement is a matter of contract interpretation and therefore appropriate for review on a motion to dismiss.").

[83] *See, e.g.*, *Touch of Italy Salumeria & Pasticceria, LLC v. Bascio*, 2014 WL 108895, at *4 (Del. Ch. Jan. 13, 2014) ("Pursuant to this Court's well-established principles of contract interpretation, and recognizing that LLCs are creatures of contract, I must enforce LLC agreements as written.") (internal quotations omitted).

[84] Am. Compl. ¶¶ 49, 77. The failure to identify specific contractual provisions in the Amended Complaint alleged to have been breached is serial throughout the pleading and provides a further basis for dismissal. *See Coca-Cola Beverages Fla. Hldgs, LLC v. Goins*, 2019 WL 2366340, at *3 (Del. Ch. June 4, 2019) ("Count I fails to state a claim for relief under the LLC Agreement because the Amended Counterclaims do not identify any

20

the individual Defendant's compensation, let alone *any* facts to support the assertion that either of the individual Defendants was paid "excessive remuneration."[85] Further, a plain reading of Section 6.1 of the LLC Agreement unambiguously reveals that a failure to make distributions to Members is not a breach of the LLC Agreement.

Section 6.1 of the LLC, which governs distributions, is broken down into four subsections.[86] Subsections (a) and (d) contain general information regarding distributions, and subsections (b) and (c) split up the distributions into one of two categories—tax distributions and distributions made for any other reason.[87] More specifically, subsections (b) and (c) outline what, if anything, triggers each type of distribution and how the amount of the distribution is to be calculated.[88]

---

provision of that contract that allegedly was breached.") (citing *US Ecology, Inc. v. Allstate Power Vac, Inc.*, 2018 WL 3025418, at *5–7 (Del. Ch. June 18, 2018), *aff'd*, 202 A.3d 510 (Del. 2019) (dismissing breach of contract claim under Rule 12(b)(6) for failing to identify a contractual provision that was breached)).

[85] Am. Compl. ¶ 3. *Cf. Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 880 (Del. Ch. 2009) ("Under [the Rule 12(b)(6)] standard, if [Plaintiff] pleads *any* set of facts that would entitle him to relief, then the motion to dismiss must fail.") (emphasis added).

[86] *See generally* LLC Agreement §6.1.

[87] *Id.* Specifically, Subsection (a) establishes that each distribution made by the Company shall be made in accordance with Article 6 of the LLC Agreement and applicable law, and subsection (d) states distributions shall be made to the Members of record or, in the absence of a record date, to the Members owning the applicable units on the date of the distribution.

[88] LLC Agreement §6.1(b)–(c).

As explained below, neither of these provisions provide a Member with an absolute contractual right to receive a distribution.

Section 6.1(b) provides in relevant part, "the Company shall make reasonable efforts, subject to the availability of funds, to make distributions to each Member in amounts" intended to cover the income taxes Members incur in respect of the Company's taxable income so allocated to them for the immediately prior fiscal year (the "Tax Distributions").[89]  Accordingly, the Tax Distributions will only occur if the Company makes a profit and the Company has available cash to fund the potential Tax Distribution.

During the years when the Company operated at a loss, there would be no distribution to cover the taxable income allocated to each Member because, again, there would be no taxable income for a distribution to cover.  Plaintiffs have acknowledged "the Company operated at a loss almost every year that it has been in operation."[90]  According to Plaintiffs, the Company operated at a profit for tax purposes only in fiscal years 2017 and 2019.[91]  Yet, the Company made

---

[89] LLC Agreement § 6.1(b).  The amount of the Tax Distribution is calculated based on the following formula: "the sum for the immediately preceding fiscal year and for all prior fiscal years of (i) the amount of taxable income allocated to such Member for such fiscal years, multiplied by (ii) the maximum marginal federal, state and local tax rate . . . applicable to an individual taxpayer pursuant to the [tax] Code and the applicable state and local laws and regulations in Durham, North Carolina in respect of income recognized during such immediately preceding fiscal year."  *Id.*

[90] Am. Compl. ¶ 47.

[91] *Id.*

"de minimums tax distributions" to the Members in these years, amounting to "only 2.1% of each Member's reported K-1 profits."[92] Even if true, that conclusory allegation, standing alone, does not support a claim that Defendants breached a contract by failing to make adequate distributions. Plaintiffs have pled no facts to support an inference that the Company had sufficient funds to cover the Company's budgeted operational needs *and* make Tax Distributions equal to 100% of each Member's reported K-1 profits. Nor have they alleged how Defendants failed to "make reasonable efforts."[93] Thus, even if the LLC Agreement did not provide for exculpation, the facts pled by Plaintiffs would not be sufficient to support a claim that Defendants breached Section 6.1(b) of the LLC Agreement.[94]

Plaintiffs' breach of contract claim for failure to make adequate general distributions does not fare any better. Section 6.1(c), which covers any distribution made by the Company that is not a Tax Distribution, expressly allows that "[t]he Board shall have sole discretion to determine the timing of any other distribution and the aggregate amounts available for such distribution." Because subsection (c) distributions are made at the Board's sole discretion, it is within the

---

[92] *Id.*

[93] LLC Agreement § 6.1(b).

[94] Of course, the LLC Agreement does provide for exculpation, yet Plaintiffs have not even attempted to plead that the failure to make distributions to Members was the product of bad faith. This too is fatal to the claim.

23

Board's discretion to elect not to make distributions, so long as the Board exercised its discretion in good faith.[95]  And Plaintiffs have not alleged any facts that would support a reasonable inference that the Board acted in bad faith by electing not to make subsection (c) distributions.[96]

For the reasons just stated, Plaintiffs' claim that Defendants committed a breach of contract by not causing the Company to make adequate distributions to its Members (whether tax or otherwise) fails under the express terms of the LLC Agreement.  Thus, the corresponding portions of Count One must be dismissed for failure to state a claim.[97]

### 2.  The Tax Reporting Claim

Plaintiffs next make the conclusory allegation that "the Defendants have harmed Plaintiffs by . . . exposing Plaintiffs to actual and potential adverse tax

---

[95] *See Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 146–47 (Del. Ch. 2009) ("When a contract confers discretion on one party, the implied covenant requires that the discretion be used reasonably and in good faith.").

[96] *See In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, 2016 WL 3044721, at *1 (Del. Ch. May 20, 2016) (explaining that a well-pled claim of bad faith "is a *rara avis* [rare bird]" as it requires well pled facts of intentional fiduciary breaches the nature of which must allow an inference that the fiduciary knew his "action can in no way be understood as in the corporate interest").  Had Plaintiffs pled facts supporting a reasonable inference that the Board acted in bad faith, those same facts would likely have been enough to overcome the exculpation clause.

[97] *See Fannin v. UMTH Land Dev., L.P.*, 2020 WL 4384230, at *21 (Del. Ch. Aug. 28, 2020) ("The Complaint does not allege facts sufficient to create a reasonable inference that there was Cash Available for Distributions or that distributions were ceased . . . to fund the Fiduciary Defendants' own special interests.").

consequences."[98] According to Plaintiffs, in the exercise of their unchecked control over the Company and its finances, Defendants have caused the Company to misstate its revenue.[99] Specifically, Plaintiffs allege Defendants caused the Company to recognize up to 50% of the revenue from certain "support contracts" upfront and thereby deviated from Generally Accepted Accounting Principles ("GAAP"), which recommends the recognition of revenue from such contracts every month over the lifetime of the contract.[100] The deviation from GAAP, say Plaintiffs, was intended to make the Company appear more financially fit than it actually was to lenders, potential investors and existing Members.[101] According to Plaintiffs, "by engaging in this systemic mismanagement of the Company and through repeated misstatements of revenue, the Defendants intentionally misled the Company's Members, the Company's lenders and the IRS."[102]

While the Amended Complaint, once again, fails to identify any provision in the LLC Agreement that requires the Company to maintain its financial books and records in accordance with GAAP, in their Answering Brief,[103] Plaintiffs point to

---

[98] Am. Compl. ¶ 77.

[99] Am. Compl. ¶ 65.

[100] Am. Compl. ¶¶ 66, 85.

[101] *Id.*

[102] Am. Compl. ¶ 69.

[103] Of course, asserting a claim or alleging a fact for the first time in a brief filed in opposition to a motion to dismiss a complaint is no substitute for well-pled allegations in

Section 10.3 of the LLC Agreement as reflecting this requirement.[104]   Plaintiffs'

Answering Brief then cites Section 11.1 of the LLC Agreement[105] as support for the

allegation that "[b]ecause Defendants' management of the Company's finances did

the complaint itself.  *See Orman v. Cullman*, 794 A.2d 5, 28 n.59 (Del. Ch. 2002); *Feldman v. AS Roma SPV GP, LLC*, 2021 WL 3087042, at *7 (Del. Ch. July 22, 2021) (citing to *Sparton Corp. v. O'Neil*, 2017 WL 3421076, at *5 n.36 (Del. Ch. Aug. 9, 2017) (observing that a plaintiff "is bound to the factual allegations contained in its complaint [and] cannot supplement the complaint through its brief.")).

[104] Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss Pls.' First Am. Compl. (D.I. 21) ("PAB") at 19; LLC Agreement § 10.3 ("The Company shall keep or cause to be kept at its principal office complete and accurate books and records of the Company, supporting documentation of the transactions with respect to the conduct of the Company's business and minutes of the proceedings of the Board, any committee thereof and any of the Members.  The Company's financial books and records shall be maintained in accordance with GAAP.  The records shall include, but not be limited to, complete and accurate information regarding the state of the business and financial conditions of the Company; a copy of the Articles and the Agreement and all amendments thereto; a current list of the names and last known business, residence, or mailing addresses of all Members; and the Company's federal, state, and local tax returns for the Company's six most recent tax years.").  The paragraph in Plaintiffs' answering brief that points to Section 10.3 of the LLC Agreement as evidence that the Company must maintain its books and records in accordance with GAAP falls between Plaintiffs' arguments addressing the Distribution Claim and the Tax Reporting Claim.  It appears Plaintiffs intended the reference to Section 10.3 to bolster their Distribution Claim but, as best I can discern, that reference would provide the only basis to infer that the Company's alleged divergence from GAAP would give rise to a breach of contract for purposes of the Tax Reporting Claim.

[105] *Id.  See also* LLC Agreement §11.1 ("The Company shall prepare and timely file all U.S. federal, state and local and foreign tax returns required to be filed by the Company. Unless otherwise agreed by the Board, any income tax return of the Company shall be prepared by an independent public accounting firm selected by the Board.  Each Member shall furnish to the Company all pertinent information in its possession relating to the Company's operations that is necessary to enable the Company's tax returns to be timely prepared and filed.  The Company shall deliver to each Member as soon as practicable after the end of the applicable fiscal year, a **Schedule K-1** together with such additional information as may be required by the Members in order to file their individual returns reflecting the Company's operations.  The Company shall bear the costs of the preparation and filings of its tax returns.") (emphasis in original).

not comply with [GAAP] standards, the K-1s issued to each Company member are inaccurate or potentially inaccurate,"[106] and thus, Defendants' actions exposed "Plaintiffs to actual and potential adverse tax consequences."[107] As discussed below, what those "actual and potential adverse tax consequences" are remains a mystery.

To reiterate, Plaintiffs were obliged to well plead the *prima facie* elements of a breach of contract claim—a valid contract, breach of that contract and resulting damages.[108] There is no dispute that Plaintiffs have identified a valid contract—the LLC Agreement. In Defendants' view, Plaintiffs have failed to sustain their Tax Reporting Claims with well-pled allegations that Defendants actually breached any provision of that contract.[109] Given Plaintiffs' failure to identify in their pleading any provision of the LLC Agreement that Defendants allegedly breached, Defendants' argument that Plaintiffs have failed to well plead breach is persuasive.[110] But the Court need not rely on that ground for dismissal because Plaintiffs have utterly failed to plead that they have suffered cognizable harm from any breach, much less what that harm might be.

---

[106] Am. Compl. ¶ 58.

[107] *Id.*

[108] *VLIW Tech., LLC v. Hewlett–Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

[109] DOB at 14.

[110] *See Coca-Cola Beverages Florida Hldgs.*, 2019 WL 2366340, at *3; *US Ecology, Inc.*, 2018 WL 3025418, at *5–7.

27

The only damages (or harm) alleged by Plaintiffs in connection with their Tax Reporting Claim is that they were exposed to actual and potential adverse tax consequences.[111] Plaintiffs allegation "that all [M]embers have been inaccurately reporting their personal taxes" is offered in the penultimate sentence of a paragraph that walks through Plaintiffs' assumptions regarding the ramifications of Defendants' actions described in the Tax Reporting Claim.[112] But this paragraph, and the entire Amended Complaint, are devoid of any facts to support the assumption that Defendants have caused the Company to issue inaccurate K-1s, how any such inaccuracies have caused the Members inaccurately to report their personal taxes, or that Members have actually faced any harm flowing from their tax filings.[113] Accordingly, because the Amended Complaint does not properly allege an essential element of breach of contract (resulting harm) with respect to the Tax Reporting Claim, that claim must be dismissed.[114]

---

[111] Am. Compl. ¶ 77. Plaintiffs have pled the Tax Reporting Claim as a direct claim. They specifically allege "the Defendants have harmed Plaintiffs by: (i) failing to make distributions in general, and adequate tax distributions in particular, instead diverting Company funds to themselves in the form of excess remuneration; (ii) failing to follow the applicable valuation method in the Operating Agreement when determining the buyout amount to be paid to departing Series B Unitholders; and ([iii]) exposing Plaintiffs to actual and potential adverse tax consequences." *Id.*

[112] Am. Compl. ¶ 59.

[113] *Id.*

[114] *Kuroda*, 971 A.2d at 884. I note that, here again, Plaintiffs have ignored their burden to plead a non-exculpated breach of contract. There are no facts pled that would support a

### 3. The Redemption Claim

Plaintiffs' final breach of contract claim alleges Defendants failed "to follow the applicable valuation method in the Operating Agreement when determining the buyout amount to be paid to departing Series B Unitholders."[115] Specifically, Plaintiffs maintain that Defendants caused the Departing Series B Members "to be bought out at greatly inflated prices."[116] This claim misses the mark because Plaintiffs fail to recognize that the valuation method set forth in the Option Agreements is only triggered in certain circumstances, none of which were at play in any of the Departing Series B Members' redemptions.

Sections 3.1 and 3.2 of the Option Agreements provide the Company with a right to purchase Series B Units and unexercised options under a prescribed valuation method in only two limited situations, neither of which are relevant here: where the units or options "are transferred" on the holder's death to a beneficiary other than the holder's spouse, or where the holder is living and the units or options "are transferred" to the holder's spouse "pursuant to a final judgment or decree of

---

reasonable inference that Defendants' failure properly to report revenue was the product of bad faith.

[115] Am. Compl. ¶ 77. While Plaintiffs purport to invoke a valuation methodology prescribed in the "Operating Agreement," their substantive allegations actually cite to a methodology prescribed in "Section 3.2 of the Options Agreement." *See* Am. Compl. ¶¶ 50(a)–(d).

[116] Am. Compl. ¶ 50.

divorce."[117]  Plaintiffs have not alleged that any of the referenced redemptions fall within either of these circumstances.[118]  And while Plaintiffs allege that Schuler's redemption was "within the context of an impending divorce (which would have triggered the calculation of the fair market value of the units under Section 3.2)," as the allegation "impending" makes clear, Plaintiffs do not allege that Schuler's units were transferred to his spouse "pursuant to a *final* judgment or decree of divorce" as required to trigger the prescribed valuation methodology.  Thus, there is no factual basis for Plaintiffs' allegation that Defendants breached the Option Agreements or the LLC Agreement by failing to use a valuation method that was not triggered by the express terms of either contract.

### 4.  The Breach of Contract Claims Are Time-Barred

Defendants argue in the alternative that Plaintiffs' breach of contract claims must be dismissed because all of the alleged wrongful conduct or practices giving rise to those claims occurred or were in place long before the three years preceding the filing of the original Complaint on October 19, 2020.[119]  This time period is relevant because, when "determining whether an action is barred by laches, the Court of Chancery will normally, but not invariably, apply the period of limitations by

---

[117] *See, e.g.*, Exs. B & D to Doody Aff. at 3.1 & 3.2.

[118] *See, e.g.*, Exs. E, F, G & H to Doody Aff.

[119] DOB at 36.

analogy,"[120] and a three-year statute of limitations applies to claims of breach of contract (and breach of fiduciary duty).[121]

"Under Delaware law, a cause of action accrues at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action."[122] Plaintiffs' do not dispute that their claims were brought after the three-year statute of limitations expired; instead, they seek to invoke "equitable tolling."[123] Specifically, Plaintiffs argue their claims are subject to equitable tolling because "Plaintiffs reasonably relied upon the competence and good faith of Defendants as Fiduciaries of the Company."[124] While they do not expressly invoke the doctrine, it appears Plaintiffs may also be advancing a "time of discovery" argument separate from their equitable tolling argument. Accordingly, I address both below.

As this court has explained, equitable tolling is one of several tolling doctrines recognized in Delaware:

> The equitable tolling doctrine is a subset of the time of discovery rule. Application of the time of discovery rule delays the starter's gun for the statute of limitation in certain narrowly carved out limited circumstances when the facts at the heart of the claim are so hidden that a reasonable plaintiff could not timely discover them. These scenarios include instances: (1) where the defendant has fraudulently concealed

---

[120] *Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 769 (Del. 2013).

[121] 10 *Del. C.* § 8106; *Fike v. Ruger*, 754 A.2d 254, 260 (Del. Ch. 2009).

[122] *Fannin*, 2020 WL 4384230, at *11 (internal quotations omitted).

[123] PAB at 26.

[124] *Id.*

key facts; (2) where the injury was inherently unknowable such that discovery of its existence is a practical impossibility; and (3) where a plaintiff reasonably relies on the competence and good faith of a fiduciary who is alleged to have engaged in wrongful self-dealing (also referred to as the equitable tolling doctrine).[125]

According to Plaintiffs, "due to the Defendants' unchecked and plenary control over all aspects of the Company, Plaintiffs could not have become objectively aware of the Defendants' misconduct and breaches until they received responses to the Demand and subsequently continued to learn of further misconduct through the course of this ligation."[126]

Plaintiffs bear the burden of pleading facts that allow a reasonable inference that the statute of limitations should be tolled,[127] and, even then, relief from the statute extends only to the point in time when Plaintiffs were put on inquiry notice.[128] "That is to say, no theory will toll the statute beyond the point where the plaintiff

---

[125] *AM Gen. Hldgs. LLC v. Renco Gp., Inc.*, 2016 WL 4440476, at *15 (Del. Ch. Aug. 22, 2016) (internal quotation marks omitted) (citing *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *6 ("Under the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary.")).

[126] PAB at 26.

[127] *See Fike*, 754 A.2d at 261 ("The plaintiffs bear the burden of proving that tolling is available."); *AM Gen. Hldgs.*, 2016 WL 4440476, at *13 (holding plaintiff bears the burden of pleading facts that allow a reasonable inference the statute of limitations should be tolled).

[128] *See In re Tyson Foods*, 919 A.2d 563, 585; *Fike*, 754 A.2d at 260; *AM Gen. Hldgs.*, 2016 WL 4440476, at *13.

was objectively aware, or should have been aware, of facts giving rise to the wrong."[129] With these principles in mind, as the Court considers Plaintiffs' tolling arguments, it must address "three separate questions: (1) whether the discovery rule applies because [Plaintiffs'] injury was inherently unknowable; (2) whether [Defendants'] status as a fiduciary implicates equitable tolling; and (3) if the answer to either of those questions is yes, when (if ever) [were Plaintiffs] on inquiry notice of [their] claims?"[130]

Under Delaware law, "[f]or the limitations period to be tolled under [the inherently unknowable] doctrine, there must have been no observable or objective factors to put a party on notice of an injury, and plaintiffs must show that they were blamelessly ignorant of the act or omission and the injury."[131] As described above, Plaintiffs enjoyed information rights under the LLC Agreement and could have requested books and records at any time.[132] When a plaintiff enjoys contractual information rights and the ability to enforce those rights summarily in this court,[133] the plaintiff's challenge to demonstrate that he made reasonable inquiry is greater.[134]

---

[129] *Tyson Foods*, 919 A.2d at 585.

[130] *AM Gen. Hldgs.*, 2016 WL 4440476, at *14.

[131] *Dean Witter*, 1998 WL 442456, at *5.

[132] LLC Agreement, § 10.5.

[133] *See* 6 *Del. C.* § 18-305.

[134] *See Fike*, 754 A.2d at 261; *AM Gen. Hldgs.*, 2016 WL 4440476, at *13 (holding that with inspection rights "in hand, [a plaintiff] cannot be heard to argue that discovery of the

The alleged wrongs that are the subjects of each of the breach of contract claims advanced by Plaintiffs occurred well before the three years preceding the October 2020 filing of Plaintiffs' original complaint and Plaintiffs' 2019 demand to inspect Company books and records. Plaintiffs, therefore, were obliged to plead facts that would justify their delay in pursuing their claims. As explained below, they have not done so.

### a. The Distribution Claim Is Time-Barred

The Amended Complaint makes clear that the alleged failures to make distributions followed a practice that had been in place in the Company for far longer than three years before Plaintiffs filed the original Complaint.[135] Section 6 of the LLC Agreement describes, in detail, when distributions shall be made, and Plaintiffs were or should have been aware of any rights or obligations imposed by this scheme since becoming Members. The Amended Complaint pleads no facts that would allow an inference that Plaintiffs made a timely inquiry regarding Tax Distributions even though they easily could have done so.[136] Because tolling stops once a plaintiff "knew or had reason to know of the facts constituting the wrong,"[137] I am satisfied

---

facts supporting its breach claims . . . was a 'practical impossibility'") (citing *Dean Witter*, 1998 WL 442456, at *5–6 (holding that "the running of the statute of limitations is tolled while the discovery of the existence of a cause of action is a practical impossibility")).

[135] Am. Compl. ¶¶ 11, 19, 22, 23, 47; original Compl. ¶ 59.

[136] Am. Compl. ¶ 59.

[137] *Dean Witter*, 1998 WL 442456, at *6.

that both Plaintiffs were on inquiry notice of the Company's alleged failure to make the requisite distributions to the Members well before three years from the filing of the original complaint.

That holds true as well for Plaintiffs' attempt to invoke equitable tolling. "[E]ven where defendant is a fiduciary, a plaintiff is on inquiry notice when the information underlying plaintiff's claim is readily available."[138]  Once they became Members, the information underlying the Distribution Claim was readily available had Plaintiffs exercised their right to ask for it.  By failing to do so under the circumstances pled in the Amended Complaint, Plaintiffs cannot position themselves to seek tolling of the otherwise expired statute of limitations as a matter of law.

### b.  The Tax Reporting Claims Are Time-Barred

In the Tax Reporting Claims, Plaintiffs allege that the Members were provided with misstated K-1s and therefore "all [m]embers have been inaccurately reporting their personal taxes."[139]  Plaintiffs have not alleged that the Company has recently, or ever, altered its methodology for preparing K-1 statements.  Accordingly, based

---

[138] *Id.* at *8.

[139] Am. Compl. ¶ 59.  Fouts likely had actual notice of the Tax Reporting Claim once he became the Chief Financial Officer of the Company in February 2012.  Am. Compl. ¶¶ 3, 90.  While I need not decide the laches question on that basis, I note that it comes with ill-grace for the Company's former CFO to feign ignorance of the Company's accounting practices when those practices had not meaningfully changed from the Company's inception to now.

on the pleadings, it appears the Company's practices that resulted in potentially incorrect K-1 statements have been in place for longer than the presumptive three-year statute of limitations.[140] To the extent these practices raised questions, Plaintiffs had a remedy—seek information from the Company as they were contractually entitled to do. If, as they say, Plaintiffs lacked the information needed to assert timely Tax Reporting Claims, that "lack of knowledge was due to [their] failure to exercise [their] right[s] to obtain information, as provided by the [Limited Liability Company Agreement] and by law. 'Equity aids the vigilant, not those who slumber on their rights.'"[141]

As stated above, tolling stops once a plaintiff "knew or had reason to know of the facts constituting the wrong."[142] I am satisfied that both Plaintiffs were on inquiry notice of the Tax Reporting Claims for far longer than the statutory period of three years. The Tax Reporting Claims are time-barred.

---

[140] Percona was formed in 2012 and Plaintiffs Erisman and Fouts have been Members since 2012 and 2013, respectively. Fouts served as the Company's CFO from February 2012 through June 2014, a position that would typically afford Fouts with information related to the Company's accounting practices. Plaintiffs have not alleged that Percona has changed its accounting practices, including the methods it uses to prepare K-1 statements for its Members. Instead, Plaintiffs allege that "Percona has never issued corrected K-1 statements for any prior tax year." Am. Compl. ¶ 59.

[141] *See Fike*, 754 A.2d at 262 (*quoting Adams v. Jankouskas*, 452 A.2d 148, 157 (Del. 1982)).

[142] *Dean Witter*, 1998 WL 442456, at *6.

### c. The Redemption Claim Is Time-Barred

Plaintiffs allege that Defendants caused the Departing Series B Members "to be bought out at greatly inflated prices."[143] Specific dates have not been provided for these redemptions, but the Amended Complaint does allege that the Company bought out one of the Departing Series B Member's options in August 2017.[144] Given that Plaintiffs filed the original Complaint on October 19, 2020, under the presumptive three-year statute of limitations, any claim resting on events that occurred prior to October 19, 2017 would be considered untimely. Given that each of these redemptions coincided with the departure of an officer and Member of the Company, it would be logical that the remaining Members would be aware of such departures and associated redemptions, especially in a closely held company such as Percona. "A court of equity moves upon considerations of conscience, good faith, and reasonable diligence."[145] I am satisfied that Plaintiffs have failed to act with reasonable diligence, and so the Redemption Claim is likewise time-barred.

---

[143] Am. Compl. ¶ 50.

[144] Am. Compl. ¶ 50(b).

[145] *Whittington v. Dragon Gp., L.L.C.*, 991 A.2d 1, 8–9 (Del. 2009) (quoting *Fed. United Corp. v. Havender*, 11 A.2d 331, 343 (Del. 1940)).

## C. Count Two – Breach of Fiduciary Duty

Plaintiffs allege that "Defendants, as Managers of the Company and pursuant to its LLC Agreement, owe a duty of loyalty to the Company and its Members" and that "Defendants breached their fiduciary duties by engaging in a scheme over the course of many years intended to enrich themselves at the expense of the Plaintiffs."[146]  For reasons explained above, these allegations against Defendants must be analyzed in light of the terms of the LLC Agreement.

In the Amended Complaint, Plaintiffs attempt to characterize what fiduciary duties, if any, are still in play under the LLC Agreement by alleging that "the Defendants are not exculpated for 'liability for acts or omissions not in good faith or which involve intentional misconduct or knowing violation of Law, (ii) liability with respect to any transaction from which [Defendants] derived an improper personal benefit, and (iii) liability from any breach of [Defendants'] duty of loyalty to the Company."[147]  That construction of Section 9.1 of the LLC Agreement ignores its clear terms.

Section 9.1(a), cited by Plaintiffs in an attempt to establish the applicable fiduciary duties, provides the Directors and their "affiliates" with exculpation against monetary liability for certain types of claims.  "It does not restrict, modify,

---

[146] Am. Compl. ¶¶ 81, 83.

[147] Am. Compl. ¶ 81.

or eliminate fiduciary duties."[148]  But Section 9.1(b) of the LLC Agreement *does* modify the fiduciary duties owed by the Directors and their "affiliates" by "replacing" those duties with a contractual standard of care that holds directors to account when "acting in connection with the Company's business or affairs" only when they fail to rely on the provisions of the LLC Agreement in good faith.[149]  This requirement to act in good faith corresponds with the default standard of loyalty under Delaware law.[150]  So, I will test the breach of fiduciary duty claims set forth in Count Two against this framework.

Count Two, styled as a breach of fiduciary duty count, recasts the previously discussed Distribution Claim and Tax Reporting Claim as breaches of fiduciary duty, and then asserts the Dilution Claim, Valuation Claim and Failure to Sell the Company Claims.  For reasons set forth above, Plaintiffs fail to support the Distribution Claim and Tax Reporting Claim with well-pled allegations of bad faith and both are time-barred, so it follows that Plaintiffs cannot recycle those claims as breach of fiduciary duty claims.  I address each of the remaining three claims in turn.

---

[148] *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 663 (Del. Ch. 2012).

[149] LLC Agreement § 9.1(b).

[150] "Bad faith" is another index for the fiduciary duty of loyalty.  *Stewart v. BF Bolthouse Holdco, LLC*, 2013 WL 5210220, at *11 (Del. Ch. Aug. 30, 2013) ("[T]he duty of loyalty encompasses more than interested transactions and also covers director actions taken in bad faith.").

## 1. The Dilution Claim

In the Dilution Claim, Plaintiffs allege that, as Series B Unitholders, they were entitled to, but did not receive, prior notice of the issuance of the Series C Units in connection with the Tokutek Acquisition and that the issuance resulted in the improper dilution of their Series B Units.[151] An unfair dilution claim belongs to the entity whose equity is the subject of the claim.[152] When a stockholder purports to bring a dilution claim, he must satisfy the enhanced pleading requirements embedded in Chancery Rule 23.1 and our jurisprudence applying that rule.[153] Here, Plaintiffs elected not to make a demand on the Board to bring their Dilution Claim and are, therefore, required to plead facts that would support a "yes" answer to any of the three questions posed in the now-settled three-part demand futility inquiry.[154] Plaintiffs' pleading falls well short of that mark. Nevertheless, the Court need not undertake that analysis because the Dilution Claim, as pled, also fails to state a viable claim under Chancery Rule 12(b)(6).

According to Defendants, Plaintiffs have made three concessions, by allegation or omission, that are fatal to their Dilution Claim. *First*, the Amended

---

[151] Am. Compl. ¶¶ 34, 37.

[152] *See Brookfield Asset Mgmt. v. Rosson*, 261 A.3d 1251, 1278 (Del. 2021) (holding that dilution claims are "exclusively derivative").

[153] *Id.*

[154] *See United Food & Com. Workers Union v. Zuckerberg*, 262 A.3d 1034 (Del. Sept. 23, 2021) (adopting "unified" three-part test for demand futility).

Complaint acknowledges that Plaintiff Fouts was the Company's Controller at the time of the Tokutek Acquisition.[155]  *Second*, the Amended Complaint fails to allege that the Series B Unitholders were entitled to prior notice of either the Tokutek Acquisition or the issuance of the Series C Units to fund that acquisition; rather, Plaintiffs simply allege they were not given notice.[156]  And *third*, Plaintiffs do not allege that they would have been entitled to exercise any consent or blocking rights had they received advance notice of the Tokutek Acquisition.  According to Defendants, for these reasons alone, all claims regarding the Tokutek Acquisition and the related issuance of the Series C Units should be dismissed.  I agree.

The LLC Agreement did not require that the Series B Unitholders receive any prior notice of the Tokutek Acquisition.  In fact, the LLC Agreement expressly and exclusively vests the Series A Member with the authority to cause and approve the issuance of additional units and the admission of any additional Member, with no provision for notice to, or approval by, Series B Members.[157]  Also, Section 8.4(b) of the LLC Agreement expressly provides that the vote of the holders of a majority of the Series A Units (here, Zaitsev) "shall constitute the act of the Members," and that any action permitted by the LLC Agreement may be taken without prior notice.

---

[155] Am. Compl. ¶ 3.

[156] Am. Compl. ¶ 37.

[157] LLC Agreement (Ex. A to Doody Aff.) at § 5.1.2 & 8.4(b)(iv).

If Defendants had no duty to provide notice, there could be no breach of contractual fiduciary duties for failing to provide such notice.

By expressly empowering the Series A Member to authorize, create and issue additional series of units, without any stated limitation (Section 5.1.2), the LLC Agreement also expressly contemplates potential dilution of Series B Units (and all units for that matter). Thus, even if Plaintiffs were diluted, such dilution would not constitute a breach of fiduciary duty.[158] This is especially so given the Amended Complaint's lack of any non-conclusory allegations that Defendants engaged in the Tokutek Acquisition in bad faith or for self-interested purposes.[159]

---

[158] *See U.S. Cellular Inv. Co. of Allentown v. Bell Atl. Mobile Sys., Inc*., 677 A.2d 497, 504 (Del. 1996) (affirming the Court of Chancery's dismissal of fiduciary duty claim against general partner of limited partnership as "correct as a matter of law," stating that while the complaint alleged that the defendant acted intentionally, it "[did] not assert that [Defendant] acted in knowing breach of the Agreement.").

[159] *See* LLC Agreement. § 9.1(a) (providing that Directors will be liable only for failure to exercise good faith in the execution of their obligations under the LLC Agreement); LLC Agreement. § 9.1(b) (exculpating directors from liability except for allegations of bad faith or breach of the duty of loyalty). Any suggestion in the Amended Complaint that Basil, a Series B Member, acted against the interests of the Company and the other Series B Members by "caus[ing] the Series B Unitholders to be diluted" rests on the unreasonable inference that he would act against his own best interests. *See* Am. Compl. ¶ 84. The same is also true with respect to Zaitsev and his Series A Unit holdings, as the Series C Units had payment preferences to all existing units. *See* Am. Compl. ¶ 33. While this court will afford a plaintiff all reasonable inferences flowing from well-pled facts, this court is not obliged to make unreasonable inferences when assessing the strength of a pleading under Rule 12(b)(6). *See, e.g.*, *Brehm v. Eisner*, 746 A.2d 244, 257 (Del. 2000) (in affirming Court of Chancery's dismissal of derivative complaint for failure to set forth particularized facts creating a reasonable doubt that the director defendants conduct was protected by the business judgment rule, the Supreme Court agreed with this court's finding that allegations regarding Michael Eisner's conduct "were illogical and counterintuitive" because the alleged conduct "would dilute the value of Eisner's own very substantial holdings."); *Clinton*, 977 A.2d, at 895 (holding that, in reviewing a complaint under Rule 12(b)(6), the

Plaintiffs also allege that "[u]pon information and belief, the degree of dilution of the Series B Unitholders by the issuance of the Series C Units is far out of proportion to the actual value of the Tokutek Acquisition."[160] This conclusory allegation, however, stands untethered to any supporting facts and, as such, is entitled to no weight.[161]

## 2. The Valuation Claims

Plaintiffs provide no specific factual allegations to support their claim that "the Defendants . . . caused the Company to incur expense by providing false information to the IRS in the 409A valuation created contemporaneously with the Tokutek Acquisition."[162] This valuation purportedly was issued as of September 30,

_____

court does not "simply accept conclusory allegations unsupported by specific facts [or] draw unreasonable inferences in the plaintiff's favor"); *cf. In re Lukens Inc.*, 757 A.2d 720, 731–32 (Del. Ch. 1999) ("If a complaint merely alleges that the directors were grossly negligent in performing their duties in selling the corporation, without some factual basis to suspect their motivations, any subsequent finding of liability will, necessarily, depend on finding breaches of the duty of care, not loyalty or good faith.").

[160] Am. Compl. ¶ 39.

[161] *See*, *e.g., Griffin Corp. Servs., LLC v. Jacobs*, 2005 WL 2000775, at *6 (Del. Ch. Aug. 11, 2005) (considering allegations made only on "information and belief," and finding that "[s]uch a bald statement, without further factual allegations to support it, is merely conclusory and need not be accepted as true"); *Neurvana Med., LLC v. Balt USA, LLC*, 2020 WL 949917 (Del. Ch. Feb. 27, 2020) (holding a claim for breach of nondisparagement clause made merely "[u]pon information and belief" was unsupported by well-pleaded facts) (citation omitted); *Encite LLC v. Soni*, 2008 WL 2973015, at *11 (Del. Ch. Aug. 1, 2008) (finding allegations "on information and belief" conclusory and insufficient to support a claim of civil conspiracy).

[162] Am. Compl. ¶ 84.

2014 (the "2014 409A Valuation").[163] Notably absent from the Amended Complaint are any factual allegations regarding what either Zaitsev or Basil did to cause the Company to submit the 2014 409A Valuation to the IRS, or what damages the Company or Members incurred as a result of that submission. According to Plaintiffs, Defendants "deliberately manipulated 409A valuations of the Company Units and options to avoid paying taxes for employee compensation when issuing LLC Unit options."[164] Yet, the Amended Complaint does not plead any facts to support the conclusory allegation that Defendants knew the valuation contained false information, let alone any facts regarding how Defendants deliberately manipulated the valuation for a nefarious purpose.

As best I can discern, Plaintiffs attempt to support an inference of wrongdoing by sewing together a series of seemingly unrelated valuation "facts." First, Plaintiffs allege that the Units and Unit options "were valued at $0.001 at the inception of the LLC," but the same securities were valued at $0.00 in the 2014 409A Valuation.[165] Plaintiffs next allege that valuations "between $0.105 and $0.191 per Unit and Unit option were created in the time frame from 2015 through 2017 but ultimately would not be certified by independent, outside professional services firms because of the

---

[163] Am. Compl. ¶ 53.

[164] Am. Compl. ¶ 52.

[165] Am. Compl. ¶ 53.

Company's myriad [of] accounting issues, especially regarding revenue recognition."[166] Of course, the higher valuations recited by Plaintiffs would support their allegation that the 2014 409A Valuation was intentionally deceptive only to the extent these other valuations covered the same time period as the 2014 409A Valuation. Based on the facts pled in the Amended Complaint, however, that connection cannot reasonably be drawn because it appears the higher valuations were created sometime between 2015 and 2017, and it is not clear from Plaintiffs' pleading what time periods are addressed by these valuations. The fact that the Company's Units and Unit options increased in value after the 2014 409A Valuation was prepared does not support an inference that the 2014 409A Valuation was somehow knowingly manipulated. For that reason alone, the Valuation Claims fail as a matter of law.

Even if the Amended Complaint had adequately pled that Defendants deliberately manipulated the 2014 409A Valuation, Plaintiffs have failed to allege how this conduct caused any harm. According to Plaintiffs, as "a result of the deceptive and illegal 409A valuations commissioned by the Defendants and intended to defraud the IRS, the IRS ultimately collected approximately $90,000 in unpaid taxes for the past issued options, based upon the knowingly incorrect $0.065

---

[166] Am. Compl. ¶ 54.

valuation that was ultimately negotiated."[167]  As pled by Plaintiffs, the IRS'

investigation resulted in the Company having to pay the IRS for unpaid but accrued

taxes.[168]  In other words, these were taxes that should have been paid by the

Company but were not; the taxes were not enhanced as a result of an inaccurate or

manipulated 409A valuation.  Indeed, the Amended Complaint affirmatively pleads

that the IRS did not cause the Company to pay any fines in connection with the

unpaid employment taxes.[169]  There is simply no factual basis to infer causally

related harm.[170]

### 3.  The Failure to Sell the Company Claims

According to Plaintiffs, Defendants breached their fiduciary duties

"by ignoring multiple opportunities to sell the Company at fair market value to at

least three different qualified buyers."[171]  As a result of these alleged breaches of

fiduciary duty, Plaintiffs claim the Company and the Series B Unitholders missed

out on lucrative opportunities.[172]

---

[167] Am. Compl. ¶ 55.

[168] *Id.*

[169] Am. Compl. ¶ 51.

[170] *Malpiede*, 780 A.2d at 1094.

[171] Am. Compl.  ¶ 90.

[172] Am. Compl. ¶ 43.

One of the potential acquisition opportunities allegedly involved Oracle Corporation ("Oracle") and occurred sometime in 2013 or 2014, but the facts pled about the other two potential opportunities are sparse.[173] As for Oracle, Plaintiffs allege that Defendants or their agents advised Oracle that the value of the Company was $250 million.[174] When Oracle responded with a due diligence request, Defendants allegedly caused the Company to terminate the acquisition discussions.[175] Subsequently, between 2015 and the filing of the initial complaint, the Company was approached by two different unidentified private equity firms that were interested in acquiring the business.[176] Plaintiffs assert that both transactions failed when "the venture capitalists refused to invest in the business because of the incompetence of the management team."[177]

While Plaintiffs recognize that the LLC Agreement provides the Series A Member, Zaitsev, sole voting authority with respect to any sale of the Company, they argue they are entitled to discover whether Zaitsev withheld his voting authority in violation of his fiduciary duty of loyalty to the Company.[178] Of course, the

---

[173] Am. Compl. ¶ 40.

[174] Am. Compl. ¶ 41.

[175] Am. Compl. ¶¶ 41–42.

[176] Am. Compl. ¶¶ 60–61.

[177] Am. Compl. ¶ 61.

[178] PAB at 25.

Amended Complaint is devoid of factual allegations to support Plaintiffs' conclusory premise that the Company missed "out on a lucrative opportunity."[179] But even if I were to accept the conclusory allegation as fact, the best that could be said is that Plaintiffs have pled facts sufficient to support an inference that Defendants caused the Company to decline acquisition overtures. This is not enough to support a breach of fiduciary duty claim, particularly given the LLC Agreement's contractual standard of conduct and exculpation clause, both of which require bad faith or other disloyalty to expose a director to potential liability.[180]

### 4. The Majority of the Claims in Count Two Are Time-Barred

For the reasons explained above, the Distribution and the Tax Reporting Claims are time-barred. As explained below, the Dilution Claim is time-barred as

---

[179] PAB 8; Am. Compl. ¶ 43.

[180] *See Desimone v. Barrows*, 924 A.2d 908, 933 (Del. Ch. 2007) (holding that "because [directors] are protected by the exculpation clause, the directors can only be held liable if they act with a state of mind that is disloyal to their obligations to the corporation."). I note that a board's decision to sell or not to sell a company is typically subject to the business judgment rule's presumption that the directors "acted on an informed basis, in good faith and in the honest belief that the action was taken in the best interests of the company." *See Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds, Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *Kahn v. MSB Bancorp, Inc.*, 1998 WL 409355, at *3 (Del. Ch. July 16, 1998); *Gantler v. Stephens*, 965 A.2d 695, 706–07 (Del. Ch. 2009) (holding that plaintiffs had pled sufficient facts to rebut the business judgment rule presumption by well-pleading that defendant board members terminated discussions to sell the company for self-interested reasons). Plaintiffs have pled no facts that would allow even a pleading stage inference that the business judgment rule presumptions might be rebutted here.

to both Plaintiffs, and the Failure to Sell the Company Claims is time-barred as to Fouts.

### a. The Dilution Claim Is Time-Barred

The claims arising from the Tokutek Acquisition were known or readily knowable as of the time the terms of that transaction were publicly announced in April 2015.[181] Yet, according to the Amended Complaint, Plaintiffs did not take any actions to rectify the alleged harm they (or the Company) suffered as a result of the Tokutek Acquisition until Erisman instructed his counsel to serve the Company with the Demand in June 2019.[182] This court has observed that "a [complaint] fil[ed] after the analogous statute of limitations has run cannot be justified except in the 'rare' and 'unusual' circumstance that a recognized tolling doctrine excuses the late filing."[183] Here, there are no rare or unusual circumstances that would excuse the late filing. Accordingly, in addition to being deficient as a matter of pleading, the Dilution Claim is also time-barred.

### b. The Failure to Sell the Company Claims Are Time-Barred as to Fouts

The discussions with Oracle occurred at least six years before the initial complaint was filed. Fouts was the Company's CFO from February 2012 through

---

[181] Am. Compl. ¶¶ 31, 32.

[182] Am. Compl. ¶ 71.

[183] *In re Sirius XM S'holder Litig.*, 2013 WL 5411268, at \*4 (Del. Ch. Sept. 27, 2013).

June 2014, and the Oracle discussions occurred sometime in 2013 or 2014. Accordingly, it is likely that Fouts was the Company's Chief Financial officer during the time the Company was discussing potential transactions with Oracle. Potential acquisitions are certainly the type of information that Fouts would have known or would have had reason to know in real-time.[184] Fouts' attempt to bring the Failure to Sell the Company Claims outside the statute of limitations, therefore, cannot be countenanced.[185]

## III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss must be GRANTED.

**IT IS SO ORDERED.**

---

[184] *See Dean Witter*, 1998 WL 442456, at *7 ("Inquiry notice does not require actual discovery of the reason for the injury. Nor does it require plaintiffs' awareness of all of the aspects of the alleged wrongful conduct. Rather, the statute of limitations begins to run when plaintiffs should have discovered the general fraudulent scheme").

[185] *See Tyson Foods*, 919 A.2d at 585 (holding that "no theory will toll the statute beyond the point where the plaintiff was objectively aware, or should have been aware, of facts giving rise to the wrong.").